FILED
2005 Nov-29  PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

IN THE MATTER OF P.T., a minor,
by and through her mother, Mrs. T.,

    PLAINTIFF,

v.                                        CASE NO.: CV-04-J-3059-J

JEFFERSON COUNTY BOARD OF
EDUCATION,

    DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 29), and brief in support of said motion (doc. 30). The defendant also submitted the entire administrative record which forms the basis for this litigation (doc. 32). The plaintiff filed a response to said motion (doc. 36) as well as the declaration of plaintiff Mrs. T. (doc. 43). The defendant thereafter filed a reply (doc. 43). Following an adverse ruling on all issues in the due process hearing, the plaintiffs filed this suit. Having considered the entire administrative record, affidavit and declaration submitted, and the briefs of the parties, the court finds as follows:

### Factual Background

The plaintiff, Mrs. T., brought suit on behalf of her minor daughter, P.T., who was born March 31, 1992. Second amended complaint, ¶¶ 3, 7. P.T. began as a

student in the defendant school system in 1995-1996.  *Id*., ¶ 8.  Due to an ongoing

disagreement with defendant, the plaintiff withdrew P.T. from defendant school

system and placed her in Allen Cott School at Glenwood, Inc.  Affidavit of Susan

Wirt, at 6; H.R. 454, 582.[1]  P.T. returned to the defendant school system in August,

1997, at the age of 5.  Wirt affidavit, at 6; H.R. 455-456, 583.  P.T. has a current

diagnosis of autism and does not talk.  Second amended complaint, ¶¶ 10-11; H.R.

453.  On January 29, 2003, the plaintiff filed a request for due process hearing under

the Individuals with Disabilities Education Act ("IDEA").   Second amended

complaint, ¶ 13; Appendix 32 to Wirt affidavit; H.R. 459.  The due process hearing

was held, testimony and evidence taken, and on  August 24, 2004, the independent

hearing officer issued a 104 page opinion, finding that the defendant did not violate

any of the plaintiff's or P.T.'s rights.  Hearing Decision, at 103.

The plaintiff thereafter filed a complaint in this court on October 21, 2004.  The

plaintiff does not take issue with any of the specific findings of the hearing officer.

Rather, she re-raises the same issues here as were before the hearing officer in their

entirety.  The second amended complaint, filed February 16, 2005, focuses on three

distinct issues:[2]  Whether the defendant's decision to use a restraint harness on the

---

[1]All references to the Hearing Record are designated as H.R.___.

[2]The court is aware that the plaintiff also took issue with one incident she believed
violated her right to privacy.  *See* n. 6, infra.

2

Case 6:04-cv-03059-IPJ   Document 50   Filed 11/29/05   Page 3 of 22

school bus for transporting P.T. to and from school after she had behavioral outbursts was a violation of P.T.'s rights to a Free and Public Education ("FAPE"), whether the plaintiff was entitled to an Independent Education Evaluation ("IEE") for P.T. at the defendant's expense, and whether the observation of P.T. by Mary Paris, an employee of defendant, without prior consent by Mrs. T., violated Mrs. T.'s rights to meaningfully participate in decisions regarding a FAPE to P.T.[3] Second amended complaint, ¶¶21-35; 41-90, 91-116; declaration of Mrs. T. (doc. 43).

Since the administrative hearing concluded, P.T. was moved from Hueytown Elementary School to the Burkett Center, to which plaintiff asserts an objection.[4] Second Amended Complaint, ¶ 16; Clay affidavit, ¶ 2.  Plaintiff attended the Burkett Center previously, during the summer of 2002.  Wirt affidavit, at 13.

Although hard to discern from the second amended complaint, the plaintiff apparently seeks redress of her rights pursuant to the IDEA,  20 U.S.C. § 1400 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

---

[3]The plaintiffs also assert a fourth issue: Whether statements made by a bus driver at a public meeting violated the plaintiffs right to privacy.  *See infra*, n. 5.

[4]According to Clay, P.T. has done very well and made significant progress since entering the Burkett Center.  Clay affidavit, ¶¶ 2-7.  During the hearing, Mrs. T. testified that P.T. did not attend the Burkett Center because the option had never been offered to her.  H.R. 1100.  She then stated that in 1997, Burkett was the only option offered, until they filed their first request for a due process hearing in 2000.  H.R. 1106, 1110.  Mrs. T. testified that Fultondale has never been made an option to P.T., although she would love Fultondale because she would love to work at that school.  H.R. 1107-1110.  (The undisputed evidence is that Mrs. T. is a counselor, and used to be an elementary school teacher, in the Birmingham School system).

The testimony from the voluminous transcript of the administrative hearing is set forth below in relevant part:

**The Harness:**

The plaintiff was transported to the Burkett Center during the summer of 2002 by bus.  Wirt affidavit, ¶ 13.  Kathy Staggs, then Supervisor of Special Education Transportation, made the decision to use a harness type restraint on P.T. during the summer of 2002 after P.T. had a tantrum and accosted the summer bus aide, Sharon Ann Bynum.[5]  H.R. 83, 85, 338.  The aide reported she was having trouble keeping P.T. in her seat while the bus was moving.  H.R. 337, 345, 380.  Because the lap belt was ineffectual, the safety harness was put in place.  H.R. 382.  P.T.'s parents were not officially notified of the use of the harness in the summer of 2002, although they saw it in use.  H.R. 60-61, 86-88.

During the school year, P.T. was transported to and from Hueytown Elementary School by a special education bus.  H.R. 331. Including P.T., the bus provided transportation for six children.  H.R. 27.  A bus driver and an aide are also on the bus.  H.R. 27.  The plaintiff, who had tantrums, had an increase in such behavior and got out of her seat on the bus on more than one occasion.  H.R. 29-30, 40, 81-82, 854, 863; Wirt affidavit, at 14.  Although she was gotten back in her seat on those

---

[5]Staggs retired November 1, 2002.  H.R. 330.  She was ultimately replaced by Steven Cane.  H.R. 333.

occasions, it raised the issue of everyone's safety if P.T. was not restrained. H.R. 33-34, 35, 39. Nicky Williams, the school year bus aide, testified that the harness makes the bus ride safer. H.R. 70-71. Prior to its use, Ms. Williams had to devote her full attention to P.T., although other children were also on the bus. H.R. 72. Additionally, it had become a struggle for the aide to keep P.T. in her seat. H.R. 346, 352. All the seats on the special education bus have lap belts, however on this bus the other children apparently are all in wheelchairs. H.R. 49, 62. Clifford Dewayne Conn, a mechanic and part time bus driver for defendant, was asked to ride P.T.'s bus and observe P.T. H.R. 298-300, 303. He reported that P.T. got out of her seat and headed for the front of the bus. H.R. 304. When he took her back to her seat, she swung her arms. H.R. 304-305. Conn reported to his supervisor, Tico Sanchez, that P.T. was getting out of her seat, which presented a safety hazard for everyone on the bus. H.R. 309.

P.T. has also repeatedly hit Faye Cale, her school year bus driver.[6] H.R. 107-108; 384-88. Susan Wirt, Director of Exceptional Education and Individual Testing, stated that the issue with the harness was one of safety. H.R. 135. According to Wirt,

---

[6] The plaintiff also complains that Cale's statements at a public hearing regarding injuries she received from a "10-year-old autistic girl" violated their right to privacy. The court does not examine this issue in any depth, as all the evidence presented demonstrates that Cale was speaking out against the defendant for its failure to protect employees who were injured by students. The plaintiff argues that defendant should be held liable because "Ms. Cale violated P.T.'s rights to privacy ..." Plaintiff's response, at 31. The court can find no legal basis to hold defendant liable for Cale's speaking out against defendant. The plaintiff offers no law to support such a novel theory either.

the IDEA requires schools to provide transportation to students so that they may receive a FAPE.  H.R. 135.  The mode of that transportation is not specified by the IDEA. H.R. 135.  Rather, pursuant to Alabama Administrative Code § 290-8-9-.07, transportation is a "related service" and the IEP team must determine which related services are required for a child to obtain a FAPE.  H.R. 138, 332.

The use of the harness was addressed at the IEP held October 10, 2002 and attended by Mrs. T.  H.R. 145.  Staggs, as Director of Special Transportation, asked Wirt how to proceed because the situation with P.T. on the bus had become dangerous, and Wirt told her to be on the October 2002 IEP agenda.[7]  H.R. 336, 387-388, 902.  Mrs. T. requested the harness not be used until other alternatives were explored, and the defendant agreed.  H.R. 148, 343-344, 394-395, 474, 592, 907-909. She believed that the use of the harness in the summer had increased P.T.'s agitation. H.R. 473.  However, other options discussed at the October 2002  IEP meeting were found not to be viable.  H.R. 910.  The harness had been used on other autistic children when the lap belt did not keep them in their seats.  H.R. 345, 347.  The lack of other options was communicated to plaintiff by Sanchez, but Mrs. T. was not happy with this information since he was not in charge.  H.R. 604.

---

[7]This included, at some point, P.T. getting out of her seat and opening the emergency door.   H.R. 674.

Use of the harness was restarted in January 2003, after an individualized education plan ("IEP") meeting on January 29, 2003, which P.T.'s parents did not attend.[8] H.R. 49, 474-476; Wirt affidavit, at 14. The harness was installed on the bus that day and was used that afternoon because P.T.'s behavior had become unsafe. Wirt affidavit, at 21; H.R. 721. A letter was sent to the plaintiff that day explaining the decision to implement use of the harness. Wirt affidavit, at 21; H.R. 672-673. The use of the harness was documented in the IEP as a "related service." H.R. 216.

Since use of the harness was begun, P.T. has accepted it and no longer fights its use. H.R. 42, 81-82. Both before and after the harness was put into use, P.T. has refused to get on the bus. H.R. 70. Padding was also added over the window to prevent P.T. from injuring herself.[9] H.R. 44, 318-319. P.T. also had been throwing her shoes, which is prevented by the harness. H.R. 314.

The harness prevents P.T. from injuring others and keeps her in her seat, which the lap belt did not do. H.R. 89-90. P.T.'s behavior without the harness was a safety

[8]Clay sent a letter to plaintiff on January 8, 2003, wanting to meet with them about the IEE evaluator. H.R. 666. Because of the lack of response, she sent Mrs. T. a notice of an IEP meeting for January 21, 2003, on January 9, 2003. H.R. 168-170, 506, 667. The notice was resent on January 15, 2003. H.R. 170, 668. Because Mrs. T. could not attend at that time, the meeting was rescheduled for January 24, 2003. H.R. 512. A third notice was sent on January 21, 2003. Mrs. T. then informed the defendant she could not attend on January 24, 2003, so the defendant rescheduled the IEP meeting for January 29, 2003. H.R. 183, 187, 513, 669-670. Mrs. T. then informed Susan Clay, Exceptional Education Supervisor, that she was displeased with the manner in which P.T.'s education was implemented so she would not attend the January 29, 2003, IEP meeting. H.R. 188-189; 517, 671; Appendix 30 to Wirt affidavit.

[9]Mrs. T. complains that the padding prevents P.T. from seeing out the window and has made her more "aloof." H.R. 544.

issue.  H.R. 156.  Since use of the harness was restarted, P.T.'s tantrums have decreased and her behavior is more frequently acceptable.  H.R. 681.  The defendant has kept behavior data on the bus to see if the harness increased P.T.'s tantrums, but found no evidence that it did.  H.R. 703-704.

**The Mary Paris Evaluation:**

Mary Paris is employed by defendant as an "Autism Specialist."  H.R. 112; 684. Susan Wirt sent Paris to observe P.T. in November 2002 in an attempt to discern what, if anything, preceded P.T.'s tantrums.  H.R. 114-115, 125-126; 685.  P.T.'s parents were not informed as their consent was not needed for an informal observation.[10]  H.R. 116-117; 686, 698.  Wirt further stated that this was a classroom observation more than an observation of just P.T., further negating the need for consent pursuant to Alabama Administrative Code § 300.505.  H.R. 121, 124.  Paris submitted a report of her observations on December 1, 2002.  Plaintiff's exhibit 1, at 117-118.

**The IEE**

Plaintiff requested an independent educational evaluation ("IEE") of P.T. during the IEP meeting on October 10, 2002.[11]  H.R. 159.   Mrs. T. hoped to identify

---

[10]Because riding on the bus to observe P.T. would be considered an assessment, this had not been done.  H.R. 199-200.

[11]The plaintiff had previously requested an IEE within a formal Alabama Department of Education complaint that Mrs. T. had filed in October 2000.  Wirt affidavit, at 11. That

"triggers" for P.T.'s tantrums. Wirt affidavit, at 15; H.R. 220, 478. She wanted someone unbiased to make suggestions because P.T.'s tantrums at home and at school had increased. H.R. 535. At the request of Hueytown principal Stephanie Hendrix, Mrs. T. put this request in writing to Susan Clay, Exceptional Education Supervisor. Wirt affidavit, at 15 and appendix 25; H.R. 479; 662. Within this request, plaintiff specifically identified three individuals to be considered as evaluators. Appendix 25 to Wirt affidavit. Of these three, only Dr. Rebecca Dossett met the defendant's criteria for the IEE, although Wirt considered and checked into each of the three individuals listed. H.R. 242, 251-253, 260-261. However, Wirt did not communicate any specific criteria she was considering to the plaintiff. H.R. 284. Wirt wanted to come up with other individuals for the IEE as P.T. was not really within Dossett's area of expertise. H.R. 253-254. Clay thought someone with experience with students with severe disabilities and behavioral disorders was needed, and recommended Dr. Felicia Houston to Wirt. H.R. 663-665.

Wirt thereafter suggested Dr. Felicia Houston, who was employed at Glenwood, to Mrs. T. H.R. 174, 228, 295; Wirt affidavit, at 19. Clay told Mrs. T. that Dr. Dossett was acceptable to defendant, but also wanted her to meet Dr. Houston. H.R. 223-224. Mrs. T. wanted a behavioral specialist for the IEE but

---

evaluation, at the defendant's expense, was completed by Dr. Karen Dahle, and put in written form in September 2001, but Mrs. T. was displeased with the results for a variety of reasons. Wirt affidavit, at 11-12; H.R. 585.

refused to consider anyone from Glenwood to be the evaluator.[12]  H.R. 179, 491-492,

608.  She also refused to consider anyone affiliated with the defendant because she

wanted someone without any preconceived ideas.  H.R. 226-227, 492, 585.  Although

defendant's policy is to provide the parent three alternative names for an IEE, the

plaintiff ended up with two, Dr. Houston and Dr. Dossett.  H.R. 176, 181.  According

to Wirt, part of the purpose of the January 29, 2003, meeting was to discuss the

individuals suggested by plaintiff as well as Dr. Houston.  H.R. 182.  Mrs. T. refused

to consider Houston because of her connections with Glenwood.  H.R. 490-491.

Given the extensive history of evaluations on P.T., Wirt decided that, for

further evaluation to be useful, the purpose and goal of the evaluation needed to be

clearly established and understood, a well-qualified evaluator needed to be selected,

and the evaluator needed to have ample opportunity to observe P.T.  Wirt affidavit,

at 17.  Clay sent a letter to the plaintiff with a copy of the revised IEP from the

January 29, 2003, meeting, written notice of their rights to an IEE, as well as a

request for a meeting, as the plaintiff chose not to attend the IEP meeting.[13]   H.R.

160, 167, 198-200, 284, 484, 486, 674; Appendix 31 to Wirt affidavit.  However, the

---

[12]This is due to Mrs. T.'s insistence that there is some type of ongoing relationship between the defendant school system and Glenwood.  H.R. 584.  However, plaintiff's first choice, Sewell, was an employee at Glenwood.  Mrs. T. stated this was acceptable because Sewell did not have any direct knowledge of P.T. H.R. 481, 636.

[13]The requirements for an IEE are set forth at §290-8-9-.02(3), Ala.Admin.Code.  The defendant is required to give parents requesting an IEE information about how to obtain an IEE. This information was provided to the plaintiff on January 29, 2003.  H.R. 207.

plaintiff did not complete the information requested for the IEE at that time because the cover letter from Clay was incorrect.  H.R. 487-488.

As no response had been received from the plaintiff, on March 3, 2003, Wirt requested Clay to send another letter to the plaintiff.  Wirt affidavit, at 21; H.R. 673. Mrs. T. responded on March 28, 2003, indicating agreement for Dr. Dossett to conduct the evaluation and returning the IEE packet.[14]  H.R. 489, 609, 675; Appendix 34 to Wirt affidavit.  Wirt arranged with Dossett to conduct a three day on-site evaluation of P.T., but the day before the evaluation, Mrs. T. asked that the evaluation be postponed.  Wirt affidavit, at 22.  Mrs. T. did not want the evaluation to occur unless she could meet privately with the evaluator, at the defendant's expense, prior to the evaluation occurring.  Wirt affidavit, at 22; appendix 36 to Wirt affidavit; H.R. 612.  Mrs. T. contacted Wirt about the need for her to provide Dossett with background information, but Wirt told her that "independent" meant without background information.  H.R. 612-613.  Wirt proposed a meeting between Mrs. T., Dossett and a Board representative, but Mrs. T. declined.  Wirt affidavit, at 23.  This was unacceptable to Mrs. T.   Although she wanted to provide Dossett with background information, she did not want to do so with the IEP team because this would have negatively influenced her history with defendant.  H.R. 1088.  Mrs. T.

_____

[14]Mrs. T. testified that Dr. Dossett was her second choice and had gotten her name from P.T.'s doctor.  H.R. 483.  This letter from Mrs. T. was actually faxed to defendant on March 31, 2003.  Appendix 34 to Wirt affidavit.

wanted to share her concerns and give background information prior to the IEE, so the IEE never occurred. H.R. 614, 630. Mrs. T. later stated that Dr. Dossett was not an acceptable evaluator because she had a working relationship with the defendant. H.R. 491-493, 639-640. In fact, Mrs. T. stated that she assumed that Wirt "has gotten to her." H.R. 1097-1098.

Mrs. T. states she requested the due process hearing on January 29, 2003, because she disagreed with how defendant handled P.T.'s education. H.R. 505-506. The two issues she had were the restraint of P.T. on the bus, and the issue of who would perform the IEE. H.R. 518. She did not think P.T. was receiving a FAPE. H.R. 601. Mrs. T. further explained that she did not attend the January 29, 2003, IEP meeting because she did not think anyone would listen to her. H.R. 602. She is of the opinion her rights were violated by use of the harness after the January 29, 2003, meeting because she said not to use it at the October 2002 meeting. H.R. 603. To date, an IEE has not been performed. H.R. 1122.

### Standard of Review

This case is before the court, in a summary judgment posture, on the administrative record of the due process hearing. The court must conduct a de novo review of the hearing officer's findings. *Weiss v. School Board of Hillsborough County*, 141 F.3d 990, 991 (11th Cir.1998). However, the court is not limited to the

12

evidence in the administrative record. *Doe v. Alabama State Department of Education*, 915 F.2d 615, 657 n. 3 (11th Cir.1990). The plaintiff, as the party challenging the administrative decision, bears the burden of proof in district court. *See Clyde K v. Puyallup School District, No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994); *Angevine v. Smith*, 959 F.2d 292, 295 (D.C.Cir.1992).

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## Legal Analysis

The IDEA guarantees disabled students a FAPE. *School Board of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir.2002). To do so, a school must formulate an IEP during a meeting between the student's parents and school officials. 20

U.S.C. § 1414(d)(1)(A)-(B).  Courts must ascertain whether (1) the school complied

with the IDEA's procedures; and (2) the IEP developed through those procedures is

reasonably calculated to enable the student to receive educational benefits. *Loren F.*

*v. Atlanta Independent School System*, 349 F.3d 1309, 1312 (11th Cir.2003).  A "yes"

answer to both questions ends judicial review.  *Id*.

**The harness**

> Education agencies must provide special transportation and such
> developmental, corrective and other support services as are required to
> assist children with disabilities so they receive a free and appropriate
> public education.  All related services may not be required for each
> individual child.  Each IEP Team must determine that related services,
> if any, are required to assist a child with a disability to benefit from
> special education.

§ 290-8-9.07(3)(b)(5), Ala.Admin.Code.

> It should be assumed that most children with disabilities receive the
> same transportation services as nondisabled children.

> > (a) Children with disabilities have the right to regular
> > transportation services unless special transportation is
> > required by the individualized education program.
> > (b) Special transportation includes travel to and from
> > school and between schools ... modified vehicles,
> > additional personnel assigned to vehicles to ensure the
> > safety of the children with disabilities, or purchased
> > services involving parents or companies who use or
> > subcontract fleet vehicles.
> > ...

> > (d) As with other related services, the education agency
> > must provide transportation as a related service if it is

14

> required to assist a child with a disability to benefit from
> special education ...

§ 290-8-9-.07(7) Ala.Admin.Code.

Of course the plaintiff does not want P.T. harnessed.  No parent would. However, the defendant has an interest in protecting not only the safety of P.T., but the safety of the other students on the bus, the driver, and occupants of other vehicles and pedestrians.  P.T. had caused disruptions on the bus, was becoming increasingly hard to control, and had thrown objects as well as hit the aide and bus driver.  The plaintiff offers no evidence that less restrictive approaches which had not already been tried were available.  Mrs. T. did testify that she and Mr. T. were not available to transport P.T. themselves on a daily basis.  The plaintiff argues that no consideration was given to assigning P.T. an aide for safety on the bus.  Plaintiff's opposition, at 19.  However, the aide who was on the bus, while not specifically assigned to P.T., testified that she devoted all her time and attention to P.T., but that she could no longer control P.T.  The plaintiff has provided the court no evidence to support a finding that an aide devoted exclusively to P.T. would create a different result.

Although the plaintiff cites to the Alabama Administrative Code for support for the proposition that the defendant has a duty to provide transportation services to P.T., nothing in those regulations states that a child should be allowed to roam a

moving bus at will.[15]  In other words, the evidence is that the defendant has provided P.T. with transportation in accordance with the Alabama Administrative Code as a related service.  Given the factual circumstances of this case, the court finds that the method of providing that transportation does not violate P.T.'s rights to a FAPE.

Unlike using restraints in a classroom, a bus is a vehicle designed for transportation, not education.  Because a vehicle moves in traffic, tantrums, behavioral outbursts, throwing objects and attacking others is much more dangerous behavior on a bus than in a classroom.  The evidence before the court is that the harness was not in the nature of a straightjacket, as described by the plaintiff, but more in the nature of a harness used in a child seat.  It allows P.T. movement of her arms and legs, but prevents her from getting out of her seat or removing her shoes to throw.

---

[15]For example, plaintiff takes issue with defendant's "harnessing an eleven year old disabled child, that can not talk, in her seat on a bus for one and one-half hours, without providing her access to a restroom, water or means to communicate, while not harnessing non-disabled children that have ample means of communicating their needs, to their seats (sic) while being transported to and from school."  The ride is long because P.T.'s parents selected a school not near their home.  The board made provisions to transport P.T. there, in accordance with her parents' wishes.  As the court noted above, no parent would want to see his or her own child harnessed.  However, the plaintiff points to no non-disabled children who get out of their seats and attack aides and/or bus drivers and are still not harnessed.  Nor does the plaintiff allege that non-disabled students are provided access to restrooms, food or drinks while being bussed to and from school.  Although no evidence of how the defendant deals with non-disabled violent students on buses is before the court, the court suspects the school declines to continue transporting them.  However, because of P.T.'s disabled status, the defendant is obliged to continue transporting P.T. as a related service, regardless of her behavior.

Additionally, Susan Clay testified that the defendant had checked as to whether P.T.'s bus route could be shortened, but P.T. had problems during her shorter bus ride in the summer as well.  H.R. 788-789.

The plaintiff also asserts the harness violated P.T.'s rights under the 14th Amendment to the United States Constitution.   However, the sum of plaintiff's argument in this regard is that:

> The defendant totally fails to address the plaintiff's 14th Amendment claim alleging a violation of the plaintiff's right to bodily integrity.  As such, even if the court grant's (sic) summary judgment as to all the claims raised by the defendant, a ruling which the plaintiff submits would constitute reversible error, the plaintiff would still be entitle (sic) to a trial on the merits of her 14th Amendment claim.

Plaintiff's response, at 33.  The plaintiff offers no evidence that the harness violated P.T.'s right to "bodily integrity."   The plaintiff offers nothing to support her proposition that the 14th Amendment prohibits the use of safety restraints on special education students who threaten the safety of themselves and others by engaging in tantrums on a vehicle moving in traffic.   This falls far short of plaintiff's burden to demonstrate that there is a "genuine issue for trial."   Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587.

**Mary Paris**

The plaintiff complains that Mary Paris, an Autism Specialist employed by defendant, "evaluated" P.T. without her permission.  The defendant argues Mary Paris merely "observed" P.T.  Informed written consent is not required from a parent for a reevaluation, if no evaluations are needed or for the type of evaluations listed on the IEP to evaluate mastery of annual goals. Pursuant to an Alabama Department

of Education memorandum dated March 28, 2002, parental consent is not required for a "related service provider observation, ongoing class room evaluation, or the administration of ... assessments that are administered to all students in a class." *See* defendant exhibit 10 to administrative hearing.

Plaintiff's argument that this required parental consent to be obtained before Paris observed P.T. convolutes the wording of the requirement in question.  Clearly, the administration of assessments administered to all students is a separate clause from both observation and ongoing classroom evaluation.  To adopt plaintiff's argument, the court would have to find "observation" as capable of being "administered."  The court is not willing to do this to the English language.

Alternatively, the plaintiff points to § 290-8-9-.08(4), Ala.Admin.Code, in support of her argument that Mary Paris should not have observed P.T. in the classroom without parental consent.  The court notes that section clearly refers to "an initial evaluation ... prior to the provision of special education services..."  That section of the Administrative Code is not relevant to the facts before the court.

The plaintiff complains that Paris's observation of P.T. in the classroom violated her rights, but then argues that the "LEA turned a deaf ear on Ms. Paris', the LEA's own Autistic Specialist's, offer to conduct an assessment on P.T. to determine the impact that harnessing P.T. on the bus was having on P.T., despite the obvious

need for the same." Plaintiff's response, at 21. The court finds that Paris'

observation of P.T. violated none of the plaintiff's rights.[16]

**The IEE**

By law, parents have the right to an IEE at public expense when a parent

disagrees with an evaluation obtained by the public agency. 34 C.F.R. § 300.502. In

other words, had plaintiff disagreed with a previously conducted evaluation of P.T.,

she could seek an IEE at public expense. No such facts are before the court. Here,

the defendant agreed to pay for an IEE of P.T., even though Mrs. T. did not disagree

with a prior evaluation by the defendant. *See e.g.*, H.R. 535. Rather, she believed it

would be of assistance to determine what triggered P.T.'s tantrums, and the defendant

agreed to provide the same. *Id.* Although the plaintiff complains that the IEE has not

occurred, the court finds the sole reason no IEE has occurred is due to the plaintiff's

actions. Additionally, although the plaintiff argues that defendant is estopped from

alleging that the plaintiff was not entitled to an IEE because she never disagreed with

---

[16]The plaintiff attempts to pick and chose select portions of the Alabama Administrative Code, as demonstrated by her argument concerning Mary Paris. She does not allege that she would have consented to Paris' observation of P.T. on the bus, but claims the defendant should have allowed Paris to conduct an assessment of P.T. on the bus, as she recommended in the report of her observation. This is the same observation over which plaintiff has, in part, brought suit.

a prior evaluation (plaintiff's opposition, at 23-24), the court finds that this is not why an IEE has not occurred.[17]

Mrs. T. testified she did not want anyone with any prior information about P.T. to perform the IEE, and that she did not want Dr. Dossett to perform the IEE without background information. H.R. 637.   The plaintiff also complains that she was not provided with information regarding where an independent evaluation could be obtained, including the locations of the evaluation and the qualifications of the examiner that the education agency uses.  Plaintiff's response at 24.  The court finds that the evidence is that the plaintiff had previously obtained an IEE, knew how to ask for an IEE, got the names of potential evaluators from doctors and the Autism Society of Alabama (H.R. 481, 483) and had obtained an advocate to attend IEP meetings with her on multiple occasions.  She wanted the evaluation to occur at school, at P.T.'s home and on P.T.'s bus, and knew that the defendant envisioned a three day evaluation so that an individual could observe P.T. at home, school and on the bus. Therefore, she knew the location of the evaluation.   Because the plaintiff provided the defendant with the names of evaluators acceptable to her, Mrs. T. presumably already had the "qualifications of the examiner."  The defendant tried to provide the plaintiff with the qualifications of the examiner proposed by defendant, but the

---

[17]The court notes that the plaintiff has an absolute right to obtain an IEE at private expense, after which the defendant is required to consider the results of the evaluation. 34 C.F.R. § 300.502(c); Ala.Admin.Code § 290-8-9-.02(3)(e).  This has not occurred.

plaintiff rejected that individual as an evaluator.  None of the plaintiff's rights were violated in these regards.

The court is further of the opinion that no notice under 34 C.F.R. § 300.503 of defendant's "refusal" to initiate an evaluation of P.T. was required, because the defendant has never refused to initiate an IEE.  Rather, the sole refusal of the defendant was to consider evaluators who it deemed were not fit to perform the evaluation.  Plaintiff apparently confuses such refusal with the notice required for the refusal to perform an evaluation at all.  Plaintiff's response, at 26.  The plaintiff points to no regulation or rule of law which requires defendant to agree to pay for an evaluation by an individual the defendant finds unqualified.  The court finds no violation of the IDEA or of P.T.'s right to a FAPE is implicated by the fact that a second IEE has not occurred.

## Conclusion

The plaintiff has failed to provide any evidence that the defendant has not met its obligations under the IDEA to provide P.T. a FAPE.[18]   Therefore, the plaintiff's claims under the IDEA must fail.  Because the plaintiff's Section 504 Rehabilitation

---

[18]For the plaintiff to prevail on an IDEA claim, she would also have to prove that, as a result of the alleged denial of a FAPE, P.T. suffered actual harm.  *See e.g. Weiss*, 141 F.3d at 996.  No such showing has been made.  As numerous courts have recognized, a FAPE described in an IEP need not be the best possible education, but only one that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction.  *Loren F. v. Atlanta Independent School System,* 349 F.3d 1309, 1312 (11th Cir.2003).

Act claims are based on the same facts as their IDEA claims, these too must fail. *See Weiss*, 141 F.3d at 998.

Having considered the foregoing, and being of the opinion that no genuine issues of material fact remain and that the defendant is entitled to summary judgment in its favor as a matter of law, the court **ORDERS** that the defendant's motion for summary judgment is **GRANTED** on all of the plaintiff's claims.

**DONE** and **ORDERED** this the 29th day of November, 2005.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE